| | | |
|---|---|---|
| UNITED STATES DISTRICT COURT | | **PRIORITY SEND** |
| CENTRAL DISTRICT OF CALIFORNIA | | |

**CIVIL MINUTES -- GENERAL**

Case No.   **CV 09-1205-JFW (PJWx)**                                              Date:  November 30, 2009

Title:        Textron Financial Corporation -v- Spanish Springs II, LLC., et al.

**PRESENT:**

**HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

| Shannon Reilly | None Present |
|---|---|
| **Courtroom Deputy** | **Court Reporter** |

**ATTORNEYS PRESENT FOR PLAINTIFFS:**       **ATTORNEYS PRESENT FOR DEFENDANTS:**
                     None                                                                                  None

**PROCEEDINGS (IN CHAMBERS):**   **ORDER GRANTING TEXTRON FINANCIAL CORPORATION'S MOTION FOR SUMMARY JUDGMENT [filed 10/9/2009; Docket No. 65];**

**ORDER DENYING AS MOOT TEXTRON FINANCIAL CORPORATION'S MOTION TO STRIKE DEFENDANTS' JURY DEMAND [filed 10/8/2009; Docket No. 64]**

On October 8, 2009, Plaintiff and Counterdefendant Textron Financial Corporation ("Plaintiff" or "Textron Financial") filed a Motion to Strike Defendants' Jury Demand.  On October 9, 2009, Plaintiff filed a Motion for Summary Judgment.  On October 19, 2009, Defendants and Counterclaimants Spanish Springs II, LLC ("Spanish Springs"), John E. King, and Carole King (collectively "Defendants") filed their Oppositions.  On October 26, 2009, Plaintiff filed its Replies.  Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court found these matters were appropriate for submission on the papers without oral argument.  The matters were, therefore, removed from the Court's November 2, 2009 hearing calendar and the parties were given advance notice.  After considering the moving, opposing, and reply papers, and the arguments therein, the Court rules as follows:

**I.       Procedural and Factual Background**[1]

---

[1]To the extent any of these facts are disputed, they are not material to the disposition of the motions before the Court.  In addition, to the extent that the Court has relied on evidence to which the parties have objected, the Court has considered and overruled those objections.  As to the remaining objections, the Court finds that it is unnecessary to rule on those objections because the disputed evidence was not relied on by the Court.

### A. The Spanish Springs Loan

Spanish Springs, a California limited liability company, was formed to own certain real property in San Luis Obispo County, California. John E. King and his wife Carole King are each members of Spanish Springs. Mr. King is also the Manager of Spanish Springs and acted on behalf of his wife in obtaining the loan at issue in this case. Mr. King is a very experienced real estate developer and investor.

In early December 2006, Mr. King contacted Textron Financial and advised that he was interested in borrowing money to finance the acquisition of a parcel of real property known as Godfrey Ranch, and to develop a parcel of real property known as South Ranch. The loan would be secured by South Ranch (the "Spanish Springs Property"). He advised Textron Financial that he needed to close the loan by early January 2007. Textron Financial responded immediately, sending Mr. King a term sheet containing the terms on which it would proceed to process the application and make the loan.

The term sheet provided that the proposed loan (the "Spanish Springs Loan") would be cross-defaulted and cross-collateralized with a loan that Textron Financial had recently made in November 2006 to Mr. King on behalf of Vaquero De Los Robles, LLC (the "Vaquero Loan"). Specifically, the Spanish Springs term sheet provided that "the subject loan documents shall include a Cross Default and Cross Collateralization provision with [Textron Financial's] existing loan," i.e., the Vaquero Loan. A cross collateralization provision combines the collateral available for both loans so that both loans are secured by both pieces of property; a cross-default provision allows the lender to declare both loans in default if the borrower is in default on one.

Upon reviewing the term sheet for the Spanish Springs Loan, Mr. King contacted the loan broker, Gary Braun, and raised concerns regarding the cross-collateralization provision. Although Gary Braun told him that they could "work [the cross-collateralization issue] out," Mr. King admits that he knew that Braun had no authority to bind Textron Financial to any particular loan terms. Separate Statement of Uncontroverted Facts and Conclusions of Law ¶ 19. Notwithstanding his concerns, Mr. King and Carole King signed and returned the Spanish Springs term sheet containing the cross-collateralization and cross-default requirement on December 7, 2006, which was approximately one month before the Spanish Springs actually closed.

After receiving the signed Spanish Springs term sheet, Textron Financial processed the Spanish Springs loan application, and its management was able to approve the proposed loan just after the Christmas holiday. Once approval was obtained, Textron Financial's counsel prepared the loan documents, and on January 3, 2007, the loan documents, which included the cross-default and cross-collateralization provision, were sent to Mr. King and his counsel, Mr. Glick, for their review and approval.

After reviewing the loan documents, Mr. King contacted Mr. Braun and again raised concerns regarding the cross-collateralization requirement. Mr. Braun arranged for a teleconference with Elizabeth Valigorsky, Vice President of Textron Financial's Resort Finance Division, to discuss Mr. King's concerns. During that teleconference, Ms. Valigorsky advised Mr. King that, in order to satisfy his concerns, Textron Financial would make a "one-time" exception to its standard cross-collateralization provision and would permit Spanish Springs to repay its loan

and obtain a release of the collateral for that loan without requiring repayment of the Vaquero Loan.

Textron Financial then modified the language of the cross collateralization provision in the Spanish Springs Loan documents so that one property could be released upon payment of the money loaned on that property provided that (1) the remaining loan on the other property met the original underwriting standards that Textron Financial had used in approving the loan; and (2) the remaining loan was not in default.  The modified provision would allow Mr. King to obtain a release of the Spanish Springs Property upon repayment of the Spanish Springs Loan, so long as the Vaquero Loan still met the original underwriting standards and it was not in default.

After reviewing this modified provision, Mr. King raised no further concerns regarding the cross-collateralization provision. On January 10, 2007, Mr. King signed the Spanish Springs Loan documents, including the Loan and Security Agreement between Textron Financial and Spanish Springs (the "Spanish Springs Loan Agreement") containing the cross-default and cross-collateralization provision.[2]  Pursuant to the Spanish Springs Loan Agreement, Textron Financial agreed to loan Spanish Springs up to $4,700,000 to finance the acquisition of the Godfrey Ranch and to proceed with engineering and permitting for Spanish Springs Property.  The Spanish Springs Loan Agreement contained a "Total Agreement" term which provided:

> This Agreement, including the Exhibits, the Schedules and the other agreements referred to herein, is the entire agreement between the parties hereto relating to the subject matter hereof, incorporates or rescinds all prior agreements and understandings between the parties hereto relating to the subject matter hereof, and may not be changed or terminated orally or by course of conduct.  This Agreement may be modified or changed only in writing executed by both the Lender and the Borrower.

As an express condition of the Spanish Springs Loan and in order to induce Textron Financial to enter into the Spanish Springs Loan Agreement, John E. King and Carole King (collectively "Guarantors") executed a Payment Guaranty dated January 10, 2007 in favor of Textron Financial (the "Guaranty").  Pursuant to the Guaranty, the Guarantors unconditionally guaranteed Spanish Springs' obligations to Textron Financial under all documents executed in connection with the Spanish Springs Loan.  The Guarantors expressly agreed that their obligations were independent of Spanish Springs' obligations and waived any right to require Textron Financial to proceed against or exhaust any other obligation or security.

---

[2]In order to conform the Vaquero Loan documents to the Spanish Springs Loan documents, on January 10, 2007, Textron Financial and Vaquero De Los Robles, LLC ("Vaquero") also entered into a loan modification agreement for the Vaquero Loan ("Vaquero Modification Agreement"), which added the identical cross-default and cross-collateralization provision that had been agreed to by Mr. King in connection with the Spanish Springs Loan.  Like the cross-collateralization provision in the Spanish Springs Loan documents, the cross-collateralization provision in the Vaquero Modification Agreement allowed Mr. King to repay the loan on one property and to obtain the release of that property, provided that the remaining loan still met the original underwriting standards and was not in default.

In accordance with the terms of the Spanish Springs Loan Agreement, Textron Financial advanced $2,400,000 to Spanish Springs at or about the closing of the Spanish Springs Loan and later advanced additional amounts.

### B. Default on the Vaquero and Spanish Springs Loans

The Vaquero Loan matured on November 2, 2008, and Vaquero defaulted on the loan when it failed to timely pay all outstanding principal, accrued and unpaid interest, and all other amounts due under the Vaquero Loan. Although in the fall of 2008 Textron Financial and John E. King discussed an extension of the maturity date of the Vaquero Loan, the parties never reached an agreement to extend or modify the loan.

As a result of the default on the Vaquero Loan and pursuant to the cross-default provision in the Spanish Springs Loan Agreement, Spanish Springs defaulted on the Spanish Springs Loan, and it became immediately due and payable. By letter dated December 15, 2008, Textron Financial formally notified Spanish Springs and the Guarantors of the default under the Spanish Springs Loan documents and demanded Spanish Springs and the Guarantors cure the default. To date, neither Spanish Springs nor the Guarantors have paid the amounts due and owing under the Spanish Springs Loan.

### C. The Action

On February 19, 2009, Textron Financial filed its Complaint in this action against Defendants, and on March 25, 2009, Textron Financial filed its First Amended Complaint. In its First Amended Complaint, Textron Financial alleges the following claims for relief: (1) foreclosure of deed of trust; (2) foreclosure of security interest; and (3) breach of guaranty.

On April 13, 2009, Defendants filed their Answer, asserting twenty-two affirmative defenses, and filed a Counterclaim, alleging the following claims for relief: (1) fraud; (2) breach of contract; and (3) intentional interference with contract and prospective economic advantage.

Spanish Springs filed a bankruptcy petition in the Bankruptcy Court for this District, and thus Textron Financial's foreclosure claims are currently stayed. Accordingly, on October 8, 2009, Textron Financial only moved for Summary Judgment on its third claim for relief for breach of guaranty against John E. King and Carole King, and on Defendants' counterclaims.

In their Memorandum of Contentions of Fact and Law filed on November 20, 2009 and Pretrial Conference Order lodged on November 21, 2009, Defendants represented to the Court that they have abandoned their counterclaim for interference with contract and prospective economic advantage and the majority of their affirmative defenses. The only remaining counterclaims at issue are fraud and breach of contract, and the only remaining affirmative defenses at issue are (1) estoppel; (2) financial duress; (3) failure to disclose a material fact; (4) failure to mitigate; (5) bad faith; and (6) failure to behave in a commercially reasonable manner.

## II. Legal Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure materials

on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A party opposing a properly made and supported motion for summary judgment may not rest upon mere denials but must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data."). In particular, when the non-moving party bears the burden of proving an element essential to its case, that party must make a showing sufficient to establish a genuine issue of material fact with respect to the existence of that element or be subject to summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue of fact is not enough to defeat summary judgment; there must be a genuine issue of material fact, a dispute capable of affecting the outcome of the case." *American International Group, Inc. v. American International Bank*, 926 F.2d 829, 833 (9th Cir. 1991) (Kozinski, dissenting).

An issue is genuine if evidence is produced that would allow a rational trier of fact to reach a verdict in favor of the non-moving party. *Anderson*, 477 U.S. at 248. "This requires evidence, not speculation." *Meade v. Cedarapids, Inc.*, 164 F.3d 1218, 1225 (9th Cir. 1999). The Court must assume the truth of direct evidence set forth by the opposing party. *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992). However, where circumstantial evidence is presented, the Court may consider the plausibility and reasonableness of inferences arising therefrom. *See Anderson*, 477 U.S. at 249-50; *TW Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 631-32 (9th Cir. 1987). Although the party opposing summary judgment is entitled to the benefit of all reasonable inferences, "inferences cannot be drawn from thin air; they must be based on evidence which, if believed, would be sufficient to support a judgment for the nonmoving party." *American International Group*, 926 F.2d at 836-37. In that regard, "a mere 'scintilla' of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997).

### III.     Discussion

For the most part, the parties agree that Rhode Island law governs their dispute, based on the application of California's choice of law principles and the Rhode Island choice of law clause contained in the Spanish Springs Loan Agreement and the Guaranty. To the extent that Defendants argue that California law should apply to certain discrete issues, those issues are irrelevant to the disposition of this Motion. Accordingly, the Court applies Rhode Island law.

#### A.     Breach of Guaranty

In order for Textron Financial to prevail on its claim for breach of the Guaranty as alleged in its third claim for relief, Textron Financial must prove: (1) the existence of a contract; (2) the breach of that contract; and (3) damage to the plaintiff. *See Petrarca v. Fidelity and Cas. Ins. Co.*, 884 A.2d 406, 410 (R.I. 2006); *Feinstein v. Brown*, 432 F. Supp. 2d 258, 269 (D. R.I. 2006).

Defendants concede that they signed the Guaranty and that they failed to pay the amounts due after the default on the Spanish Springs Loan. Defendants primarily argue that Textron

Financial's Motion for Summary Judgment should be denied because they were fraudulently induced into signing the Spanish Springs Loan documents and the Vaquero Modification Agreement. They raise fraud as both an affirmative defense[3] and counterclaim.

"Fraud vitiates all contracts." *Bogosian v. Bederman*, 823 A.2d 1117, 1120 (R.I. 2003) (quotations and citations omitted). "'[I]f one is induced to enter into a contract based upon a fraudulent statement from the other party to the contract, then the party who has been fraudulently induced is not bound by the contract.'" *Id.* (quoting *Bjartmarz v. Pinnacle Real Estate Tax Service,* 771 A.2d 124, 127 (R.I. 2001)). In such a case, the injured party may elect to either rescind the contract or affirm it and sue for damages in an action for deceit. *Id.* However, to achieve either remedy, Defendants must prove that (1) Textron Financial made a false representation or concealed a material fact, and (2) that Defendants justifiably relied thereon to their damage. *See Bogosian*, 823 A.2d at 1120; *Halpert v. Rosenthal*, 107 R.I. 406, 415 (1970); *Banco Totta e Acores v. Fleet Nat'l Bank*, 768 F. Supp. 943, 947 (D. R.I. 1991).

In their fraud counterclaim and affirmative defense for failure to disclose a material fact,[4] Defendants allege that Textron Financial deliberately concealed that it would require cross-collateralization of the two loans until shortly before the close of the Spanish Springs Loan.[5] However, contrary to the allegations of the Counterclaim and affirmative defense, it is undisputed that Textron Financial disclosed that it would require cross-collateralization of the two loans in its term sheet describing the terms for the Spanish Springs Loan which was delivered to John E. King in early December 2006. Moreover, Mr. King admits that he was fully aware of the cross-collateralization provision in the term sheet for the Spanish Springs Loan before he signed it. *See* Separate Statement of Uncontroverted Facts and Conclusions of Law ¶ 18. While he raised concerns about the cross-collateralization provision in the term sheet with Mr. Braun and Mr. Braun advised they could "work [the cross-collateralization issue] out," Mr. King admits that he knew that Mr. Braun had no authority to bind Textron Financial. *See* Separate Statement of Uncontroverted

---

[3]Defendants' Eleventh Affirmative Defense is entitled "failure to disclose a material fact."

[4]In their affirmative defense for failure to disclose a material fact, Defendants allege that "Defendants' consent to one or more of the agreements that form the basis of the First Amended Complaint was obtained through Textron's intentional failure to disclose a material fact while having full knowledge that, had Defendants known the existence of said fact, Defendants would not have consented." Answer ¶ 43. This affirmative defense is clearly based upon the same allegations included in Defendants' counterclaim for fraud.

[5]In their fraud counterclaim, Defendants also allege that Textron Financial intentionally misrepresented that (1) the Spanish Springs Loan would be substantially similar to the Vaquero Loan, and (2) that Textron Financial would promptly process the loan to give Mr. King adequate time to evaluate the transaction prior to the closing of escrow on the Spanish Springs Property. The Court concludes that Defendants have abandoned these theories, as Defendants present no argument regarding these theories in their Opposition, and they do not appear in their Memorandum of Contentions of Fact and Law, filed on November 21, 2009. The Court has nonetheless reviewed the evidence that would appear to support these theories and concludes that the evidence does not raise a genuine issue of material fact and these theories fail as a matter of law.

Facts and Conclusions of Law ¶ 19. Notwithstanding Mr. King's knowledge of the cross-collateralization requirement in the term sheet and that Mr. Braun had no authority to bind Textron Financial, Mr. King and Carole King signed the term sheet on December 7, 2006, a month prior to signing the Spanish Springs Loan documents and the Vaquero Modification Agreement. In addition, the draft loan documents, which were consistent with the term sheet and contained the cross-collateralization provision, were delivered to Mr. King and his counsel on January 3, 2007, one week prior to the closing. Accordingly, there is no evidence that Textron Financial concealed the fact that it would require cross-collateralization of the two loans.

Defendants also appear to contend that they were fraudulently induced into accepting the Spanish Springs Loan Agreement and the Vaquero Modification Agreement because Ms. Valigorsky of Textron Financial represented that Textron Financial would allow a "one-time exception" to the cross-collateralization requirement and would allow either Spanish Springs or Vaquero to pay off its loan and obtain a reconveyance of Textron Financial's deed of trust while the other loan remained outstanding. However, there is no evidence that this representation was false. Textron Financial, in response to Mr. King's concerns, in fact agreed to make a "one-time exception" to its standard cross-collateralization requirement and agreed to allow the release of either property under certain conditions. Even if this representation could somehow be construed as false, the Court concludes that Defendants could not have justifiably relied on this representation as a matter of law, where (1) the Spanish Springs Loan Agreement and Vaquero Modification Agreement unambiguously explained the conditions upon which Textron Financial would release the Spanish Springs Property or the property securing the Vaquero Loan; (2) the Spanish Springs Loan Agreement contained a "total agreement" term that provided that the Spanish Springs Loan Agreement constituted the entire agreement between the parties; (3) Defendants were represented by counsel at the time they signed the Spanish Springs Loan Agreement and the Vaquero Modification Agreement; and (4) Mr. King, an experienced real estate developer who has been a party many sophisticated loan transactions, acknowledged reading and understanding the cross-collateralization provision prior to signing the Spanish Springs Loan Agreement and the Vaquero Modification Agreement. *See LaFazia v. Howe*, 575 A.2d 182 (R.I. 1990).

Finally, Defendants argue that they were fraudulently induced to enter into the Spanish Springs Loan Agreement and Vaquero Modification Agreement because when Textron Financial made the promise that it would release the Spanish Springs property in accordance with the modified cross-collateralization provision, it did so without any intention of performing its promise. However, Defendants failed to allege this theory of fraud in their Counterclaim, and are precluded after the close of discovery and on the eve of trial from relying on this completely new and different theory in opposition to Textron Financial's Motion for Summary Judgment. A plaintiff or counterclaimant "cannot oppose summary judgment based on a new theory of liability because it would essentially blind side the defendant with a new legal issue after the bulk of discovery has likely been completed." *Rodriguez v. Countrywide Homes*, __ F. Supp. 2d __, 2009 WL 3792308, at *6 (E.D. Cal. Nov. 12, 2009) (citing *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292-1293 (9th Cir. 2000)). In this case, discovery closed on October 19, 2009, and the pretrial conference is set for December 4, 2009 and the trial is set for December 15, 2009. Even considering Defendants' new theory of fraud, the Court concludes that there is no evidence in the record that would support the claim that Textron Financial did not intend to perform its obligations under the cross-collateralization provision when it agreed to modify that provision in early January 2007.

Defendants attempt to raise an issue of fact in support of their new claim, by arguing that the discussions between Textron Financial and Mr. King in the Fall of 2008 regarding a potential extension of the Vaquero Loan somehow demonstrate that Textron Financial did not intend to perform in accordance with the cross-collateralization provision.  However, Textron Financial was not required to extend, renew, or modify the Vaquero Loan, and could propose any new terms that it believed were necessary, including terms that modified the cross-collateralization provision.  Moreover, once the Vaquero Loan was in default, Textron Financial had no obligation, contractual or otherwise, to release the Spanish Springs Property under the cross-collateralization provision, and was fully justified in offering to release its security only if the new lender would agree to Textron Financial retaining a subordinate security interest in the property.

Defendants, for the most part, failed to address the non-fraud affirmative defenses in their Opposition.  *See California Architectural Bldg. Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-324 (1986)) ("[I]f the nonmoving party will bear the burden of proof at trial as to an element essential to its case, and that party fails to make a showing sufficient to establish a genuine dispute of fact with respect to the existence of that element, then summary judgment is appropriate.").  However, the Court has reviewed the evidence that would appear to support these affirmative defenses and concludes that the evidence does not raise a genuine issue of material fact and the remaining affirmative defenses fail as a matter of law.

### B.   Defendants' Counterclaim for Breach of Contract

In their only remaining counterclaim for breach of contract, Defendants allege that Textron Financial breached the Spanish Springs Loan Agreement by failing to disburse loan funds to construct a bridge.  Defendants did not address this counterclaim in their Opposition, conceded that "[t]here is no[] evidence that Spanish Springs ever submitted a written request for funding that was not timely funded," and did not cite to any evidence supporting its breach of contract counterclaim.  *See* Separate Statement of Uncontroverted Facts and Conclusions of Law ¶ 74.  Accordingly, based on the evidence submitted by Textron Financial, the Court concludes there are no genuine issues of material fact, and Textron Financial is entitled to judgment as a matter of law on Defendants' counterclaim for breach of contract.

Defendants, for the first time in their Opposition, attempt to argue a new breach of contract theory based upon Textron's Financial's purported failure to perform its obligations under the cross-collateralization provision in the Spanish Springs Loan Agreement and the Vaquero Modification Agreement.   This theory was not alleged in Defendants' counterclaim, and Defendants cannot raise this entirely new theory of liability for the first time in opposition to Textron Financial's Motion for Summary Judgment when discovery has already closed and trial is set for December 15, 2009.  *See Rodriguez v. Countrywide Homes*, __ F. Supp. 2d __, 2009 WL 3792308, at *6 (E.D. Cal. Nov. 12, 2009).  Moreover, even considering Defendants' new breach of contract theory, there is no evidence that Textron Financial failed to perform its obligations under the cross-collateralization provision in the Spanish Springs Loan Agreement and Vaquero Modification Agreement.  Spanish Springs never repaid its loan which was a condition precedent to Textron Financial's obligations under the cross-collateralization provision.  Moreover, Defendants have not presented any evidence that Spanish Springs had funds available to repay the loan prior to the default on the Vaquero Loan.  Under the express terms of the cross-collateralization

provision, once the Vaquero Loan was in default, Textron Financial was under no obligation to release its security interest in the Spanish Springs Property.

## IV. Conclusion

For the foregoing reasons, Textron Financial's Motion for Summary Judgment is **GRANTED** in its entirety.  Textron Financial is entitled to all outstanding principal, accrued and unpaid interest, its costs and attorneys' fees, and all other amounts due under the Spanish Springs Loan.

Textron Financial's Motion to Strike Defendants' Jury Demand is **DENIED as moot.**

The parties shall meet and confer and draft a joint proposed Judgment consistent with this Order, and shall lodge the joint proposed Judgment with the Court on or before December 3, 2009. If the parties are unable to agree upon a joint proposed Judgment the parties shall each submit separate versions of a proposed Judgment, along with a declaration outlining their objections to the opposing party's version, no later than December 7, 2009.